UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 18-CV-81039-ROSENBERG
MAGISTRATE JUDGE REID

MICHAEL MARQUARDT,

     Petitioner,

v.

MARK S. INCH,[1]

     Respondent.

_____/

## REPORT OF MAGISTRATE JUDGE

### I. Introduction

Petitioner, **Michael Marquardt**, has filed a *pro se* Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his convictions for first degree murder and robbery with a firearm, entered following a jury verdict in Palm Beach County Circuit Court, **Case No. 2009-CF-005155-AMB**. [ECF No. 1]. This cause has been referred to the Undersigned for consideration and report, pursuant to 28 U.S.C. § 636(b)(1)(B)-(C) and S.D. Fla. Admin. Order 2019-02. [ECF No. 39].

For its consideration of the Petition [ECF No. 1], the Court has reviewed Respondent's Response to this Court's Order to Show Cause [ECF No. 16], copies of relevant state court pleadings, including hearing and trial transcripts, Petitioner's Reply [ECF No. 28], Respondent's Response to this Court's Supplemental Order to Show Cause [ECF No. 60], and Petitioner's Reply

---

[1]Pursuant to Fed. R. Civ. P. 25(d), because Mark S. Inch has replaced Julie Jones as the Secretary of the Florida Department of Corrections, he is automatically substituted as the proper Respondent in this case.

to that Response [ECF No. 73]. Upon such review, the Petition should be **DENIED**, as further discussed below.

## II. Claims

Construing the arguments liberally pursuant to *Haines v. Kerner*, 404 U.S. 519, 520 (1972), Petitioner raises the following grounds for relief:

1.  He received ineffective assistance of counsel when his lawyer failed to request a jury instruction for manslaughter-a lesser included offense. [ECF No. 1 at 5].

2.  He received ineffective assistance of counsel where his lawyer failed to impeach Antonio Bussey at trial with Louis Baccari's phone records. [ECF No. 1 at 7].

3.  He received ineffective assistance of counsel when his lawyer failed to properly examine the "Gas One" video which proved Petitioner's innocence. [ECF No. 1 at 9].

4.  His constitutional rights were violated when the prosecutor knowingly presented false testimony. [ECF No. 1 at 11].

5.  He received ineffective assistance of counsel when his lawyer misadvised him to reject a favorable plea agreement. [ECF No. 1 at 13].

6.  He received ineffective assistance of counsel when his lawyer failed to file a motion for judgment of acquittal or arrest of judgment. [ECF No. 1 at 15].

7.  He received ineffective assistance of counsel when his lawyer failed to have DNA swabs tested from the crime scene. [ECF No. 1 at 16].

8.  His constitutional rights were violated when the trial court allowed the jury to hear Petitioner's co-defendant using racial slurs. [ECF No. 1 at 18].

9.  His constitutional rights were violated when the trial court refused to read back all of Bussey's testimony, and unfairly emphasized the state's case. [ECF No. 1 at 20].

10. His constitutional rights were violated where his conviction was based on a crime that was not charged in the Indictment. [ECF No. 1 at 21].

11. His constitutional rights were violated when the state court refused to test DNA swabs and/or reveal fingerprint test results. [ECF No. 1 at 23].

12.     He received ineffective assistance of appellate counsel when his lawyer failed to certify a conflict under Florida law regarding newly discovered evidence. [ECF No. 1 at 25].

13.     He received ineffective assistance of appellate counsel when his lawyer failed to argue on appeal that the failure to give a manslaughter instruction to the jury was fundamental error. [ECF No. 1 at 26].

### III. Procedural History

In 2009, Petitioner, along with co-defendant Louis Salvatore Baccari ("Baccari"), was charged by indictment with first degree murder with a firearm (Count 1), robbery with a firearm (Count 2), and accessory after the fact (Count 3). [ECF No. 17-1, Ex. 1]. A jury found Petitioner and Baccari guilty of Counts 1 and 2, and he was sentenced to life imprisonment without the possibility of parole. [*Id.,* Exs. 2-3].

Petitioner appealed raising the following claims: (I) the trial court erred by denying his motion for judgment of acquittal because the state could not rule out his reasonable hypothesis of innocence; (II) the trial court erred by allowing the jury to hear his co-defendant's use of a racial slur; (III) the trial court abused its discretion when it refused to read back testimony and unfairly emphasized the state's case; (IV) the trial court abused its discretion when it refused to read the principal instruction to the jury and refused to give a "mere presence" instruction; (V) the trial court's failure to make a genuineness inquiry under Florida law requires a new trial; and (VI) Petitioner's conviction was based on a crime that was not charged in the Indictment. [*Id.*, Ex. 4]. On March 19, 2015, the Fourth District Court of Appeal ("Fourth DCA") *per curiam* affirmed Petitioner's judgment of conviction without written opinion. [*Id.*, Ex. 7]; *see also Marquardt v. State*, 163 So.3d 1217 (Fla. 4th DCA 2015).

Petitioner then filed a petition for writ of habeas corpus in the Fourth DCA, where he alleged that appellate counsel was ineffective for failing to argue that the trial court committed

reversible error by failing to give a requested instruction on a lesser included offense. [ECF No. 17-1, Ex. 10].  The Fourth DCA summarily denied the petition. [*Id*., Ex. 13].

Petitioner next filed a motion for postconviction relief pursuant to Fla. R. Crim. P. 3.850 in the trial court. [*Id*., Ex. 15]. In his motion, Petitioner raised the following claims relevant to the instant petition: (I) his lawyer was ineffective for failing to impeach Antonio Bussey with Baccari's phone records; (II) his lawyer was ineffective for misadvising him to reject the plea agreement; (III) his lawyer was ineffective where he failed to present a theory of defense; (IV) his constitutional rights were violated when the prosecution knowingly presented false testimony; (V) his constitutional rights were violated when he was convicted based on a charge not contained in the Indictment; (VI) his lawyer was ineffective for failing to file a post-trial motion for an arrest of judgment and/or judgment of acquittal; and, (VII) his lawyer was ineffective for failing to obtain DNA evidence. [*Id*.]. While his initial Rule 3.850 motion was pending, Petitioner filed a supplemental motion for postconviction relief. [*Id*., Exs. 16, 16a]. After a response from the state, the trial court denied the Rule 3.850 motion in its entirety for the reasons set forth in the state's response. [*Id*., Exs. 17; 18]. Petitioner appealed, and the Fourth DCA affirmed without a written opinion. [*Id*., Exs. 19, 20]; s*ee also Marquardt v. State*, 239 So.3d 1251 (Fla. 4th DCA 2018). Mandate issued on April 20, 2018. [ECF No. 17-1, Ex. 21].

Shortly thereafter, Petitioner filed a motion for postconviction DNA testing pursuant to Fla. R. Crim. P. 3.853 in the trial court. [*Id*., Ex. 23]. In the motion, he alleged that DNA testing would have exonerated him at trial. [*Id*.]. The trial court denied the motion for the reasons set forth in the state's response. [*Id*., Exs. 24, 25]. Petitioner appealed; and the Fourth DCA *per curiam* affirmed the trial court's ruling without written opinion on January 11, 2018. [*Id*., Ex. 27].

Petitioner then came to this Court, filing his Petition pursuant to 28 U.S.C. § 2254 on August 1, 2018. [ECF No. 1].

## IV. Threshold Issues

A. Timeliness

Careful review of the procedural history of this case confirms that less than one year of un-tolled time expired after the Petitioner's judgment became final and the filing of this federal habeas Petition. Therefore, as the Respondent correctly concedes [ECF No. 16 at 4-5], the Petition is timely filed under 28 U.S.C. § 2244(d).

B. Exhaustion

Next, the Respondent argues that several of Petitioner's claims are unexhausted and procedurally defaulted from federal habeas review. *See generally* [ECF No. 16]. In addressing the issue of exhaustion and procedural default, the Court must determine whether the claims raised here were raised in the state court proceedings, and whether the state courts were alerted to the federal nature of the claims.

Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all available state court remedies. *See* 28 U.S.C. §§ 2254(b), (c). To properly exhaust state remedies, the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. *See Castille v. Peoples,* 489 U.S. 346, 351 (1989); *see also Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 456–59 (11th Cir. 2015).

Exhaustion is not satisfied "merely" if a petitioner presents the state court with "all the facts necessary to support the claim" or even if a "somewhat similar state-law claim was made." *Kelley v. Sec'y for Dept. of Corr.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004) (citation omitted). A petitioner must instead "present his claims to the state courts such that they are permitted the

'opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.'" *Id*. For example, "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Baldwin v. Reese*, 541 U.S. 27, 32 (2004); *see also McNair v. Campbell,* 416 F.3d 1291, 1302-1303 (11th Cir. 2005).

To circumvent the exhaustion requirement, Petitioner must establish that there is an "absence of available state corrective process" or that "circumstances exist that render such process ineffective to protect [his] rights." 28 U.S.C. § 2254(b)(1)(B); *see Duckworth v. Serrano,* 454 U.S. 1, 3 (1981). The issues of exhaustion and procedural default as they relate to Petitioner's claims are addressed in the discussion section below.

## V. Statement of Facts[2]

**Rolf Severtson** ("Severtson") testified as a witness and stated at trial that he lives on the same street in Delray Beach, Florida where the victim, Blazevige, was shot to death on April 14, 2007. [T. 605-616]. Severtson recalled in the late afternoon that day, he was going out to buy food, when he heard a "pop" that sounded like a gunshot, and then observed a man running towards a pick-up truck about 300 feet away. [T. 616-17]. The dark pick-up drove away fast, and when Severtson passed the location where the pick-up had been, he saw a body lying in the street, noticed the man had been shot, and called 911, waiting there until police arrived. [T. 618-20].

A second witness, **Sandy Talbot,** who also lives in the neighborhood, testified she heard loud "pops" and then observed a large, black truck driven by a man, quickly turn around in her driveway, speeding away fast. [T. 627-34]. The truck damaged her grass as it turned around. [*Id.*].

---

[2] When referring to the trial transcripts in this case, the Court uses the transcript page numbers at the top of each page in Respondent's exhibit [ECF No. 18].

**Rosemary Herron ("Herron"),** a district manager for Townstar, a group of gas stations/convenience stores, testified that a receipt showing April 14, 2007 at 3:06 p.m., found in the victim's truck after the murder, came from a Townstar store in Okeechobee. [T. 728-34].

The victim's mother, **Judith Conway ("Conway"),** testified Blazevige had been a friend of Baccari's, and that Baccari had lived with Conway in the fall of 2006, but moved out after a week and a half, leaving behind about three boxes of clothing at her home. [T. 769, 772-73]. After leaving Baccari five or six messages on his cell phone, Conway threw out the three boxes of clothing. [ T. 778-79]. Blazevige, who was addicted to pain medication, moved out of Conway's home after Christmas 2006, and moved to Okeechobee County to "come off drugs" and be with his girlfriend. [T. 784, 790-91].

The State's main witness, **Antonio Bussey ("Bussey")**, testified that he knew Petitioner for 3 or 4 months prior to the incident. [T. 826]. During that time, Petitioner showed Bussey his gun. [T. 827]. Petitioner also introduced him to Baccari. [T. 827]. On the date of the incident, Bussey called Petitioner and asked to borrow $200. [T. 832-33]. Petitioner agreed and picked Bussey up from a restaurant in a dark pick-up truck. [T. 833-836, 997]. Petitioner was driving, and Baccari was in the passenger seat. [T. 836]. Bussey sat in the back. [T. 836-87]. When Bussey asked for the money, Petitioner said he needed to "bust a lick." [T. 838]. Bussey explained that "bust a lick" means to "[p]ick up and make a sale, anything to get money." [T. 838]. On cross, Bussey explained that he assumed Petitioner was going to "bust a lick which means make a sale." [T. 997].

Bussey knew that it was not a legal transaction and believed that Petitioner was going to sell controlled substances. [T. 839, 847]. They drove to One Stop gas station and waited while Baccari had a hushed conversation on his cell phone. [T. 848-850]. As they left the gas station,

Baccari told Petitioner "[w]hen we get there, I'm going to call your phone. I just want you to say that you're good, that you're bringing it, you got it." [T. 852]. Petitioner responded, "alright." [T. 853].

The men then left the gas station and went to a nearby residential neighborhood, where they saw a parked blue truck on the east side of the road. [T. 853]. Petitioner pulled up directly behind the truck and parked. [T. 853, 858-59]. Baccari left the truck and went to the driver's side window of the blue parked truck, where a conversation occurred. [T. 854-55]. Bussey could not see what Baccari was doing. While Bussey and Petitioner were in the car, Petitioner's phone rang. [T. 855]. He answered, saying "[I] got you, I'll be there in a minute." [T. 855]. Bussey thought a robbery was occurring. [T. 856].

A couple of seconds after the phone call, Baccari started to walk back to Petitioner's truck. [T. 856-857]. As he was walking back to the truck, the victim got out of the blue truck and said "Man, give me my money or give me my pills." [T. 861]. The victim was making his way to the passenger side of Petitioner's truck where Baccari was and as Baccari turned back towards the victim, Bussey heard a loud gunshot through the open front windows of the truck. [T. 862-64]. When the gunshot went off, Petitioner said "get in, get in." [T. 864]. When Baccari jumped into the car, he said "Hit it, go, go, go, go." [*Id.*]. Bussey, in the backseat, panicked but could not get out of the truck because it was not possible to open the backdoor of the truck from inside. [T. 865]. As Baccari got back into the truck, Bussey saw Petitioner's gun in Baccari's hands. [T. 866]. Bussey did not remember pulling into a driveway while leaving the shooting location. [T. 867-868].

As they drove away, Petitioner made a phone call and then drove to a house, parking the truck in the driveway. [T. 868-870]. The three then got into a white Kia, taking the gun with them.

[T. 872-73]. The Kia was driven by a man later identified as Thomas Marquardt, Petitioner's uncle. [T. 873]. From there, they then went to Target, where Baccari bought beer, and then on to Petitioner's house, where the three switched to Petitioner's wife's car. [T. 875-877]. In that car, they drove to a Mobil gas station where Baccari handed Bussey $50. [T. 877]. Petitioner then drove Bussey to Delray Beach where he dropped him off. [*Id*.].

A couple of days later, Petitioner showed up at Bussey's home. [T. 879]. Bussey walked out front to where Petitioner's truck was parked with Baccari in the passenger seat. [T. 880]. Through the open driver's window, Petitioner handed Bussey the gun. [T. 880]. Petitioner told Bussey to hold the gun because he didn't want Bussey to talk. [T. 881].

A few days after, Petitioner picked up Bussey at his home and drove to the same house he had driven to after the shooting. [T. 882-883]. Petitioner took the holstered gun and handed it to Thomas Marquardt, who then took it into the garage and put it in the attic. [T. 884].

On April 27, Bussey's girlfriend was arrested at their home. [T. 885]. Bussey thought that Petitioner was responsible for her arrest, so he angrily called him. [T. 888-89]. The next day, Bussey was arrested. [*Id*.]. After initially telling police he knew nothing about the murder, he told the police everything after they assured him that his girlfriend was safe. [T. 889]. Bussey was charged with first degree murder, and then accepted a guilty plea to second degree murder with a 21-year sentence and agreed to testify truthfully in the case. [T. 889-890].

On cross, Bussey acknowledged that he had initially lied to police because he was scared. [T. 903-907]. Bussey denied selling prescription drugs. [T. 912]. Bussey explained that the only reason he took the plea was because he was there when the murder occurred. [T. 981]. He said he never killed anyone. [*Id*.]. Bussey denied that he told other inmates in jail that he killed the victim.

[T. 986]. He did, however, admit that he was a convicted felon and on probation in Georgia. [T. 988].

Bussey testified that he believed he was in jail because Petitioner and Baccari identified him as the shooter. [T. 992]. On the day of the shooting, he never saw pills in Petitioner's truck, never saw any money exchanged, and never heard talk about a robbery. [T. 995]. Bussey clarified that "busting a lick" were his words and not words spoken by Petitioner. [T. 1004-05]. Bussey denied shooting the victim or ever saying he should have killed Baccari and Petitioner. [T. 1007-09]. Bussey also denied Baccari was ever inside of the gas station prior to the incident. [T. 1005].

**Thomas Marquardt ("Thomas")**, Petitioner's uncle, testified that Petitioner showed up at his house on April 14, 2007, driving a Chevrolet, king cab, four-door pick-up truck. [T. 1099-1104]. To open the back doors of a king cab truck, the front doors must first be opened. [*Id.* at T. 1103]. Thomas testified he gave Baccari, Petitioner, and Bussey, who he met for the first time that day, a ride in his white Mazda. [T. 1004-08]. At that time, Thomas testified Petitioner told him they had "just shot somebody." [1108]. After buying beer at a Target store, Thomas drove them to Petitioner's home, where he dropped all three of the men off. [T. 1109-1112]. Once there, they jumped out of Thomas's car and got into a Honda Pilot owned by Petitioner's wife. [T. 1112]. According to Thomas, before both vehicles exited the guard gate at the residential community, Baccari got out of Petitioner's car, went back to Thomas's car, looking in the back because he had lost his cell phone. [T. 1116-17]. Petitioner could not find it, but when Thomas got back to his house, he called Baccari's number, and found the phone in the bed of Petitioner's truck. [T. 1118-21]. Thomas admitted that he put the firearm in his attic. [ T. 1127-28].

When police arrived to search his home on April 29, 2007, Thomas allowed them in. [T. 1129]. When police asked him about the homicide and the firearm they recovered from the attic,

at first Thomas lied, telling them he knew nothing about the it because he was "scared" of "going to jail." [T. 1130-31]. About a month later, after receiving a subpoena from the State Attorney's Office, Thomas went to Petitioner's home, and advised him of the subpoena and that he was going to "tell the truth." [T. 1131-33]. Baccari was present during this discussion. [T. 1133]. Thomas testified that Baccari responded by stating, "wouldn't it be funny if Tom got life and we got off." [T. 1133]. Thomas also testified Baccari asked him to lie on his behalf and wanted Thomas to state that Baccari had looked "roughed up" when he saw him back on April 14, 2007. [T. 1134, 1148-49]. Thomas, however, did not agree, one way or another, to do so. [*Id.*].

On cross, Thomas testified that when they went to Target the night of the murder, Bussey stated that the gun felt good in his hands and did not appear remorseful. [T. 1143-44]. Bussey also asked Baccari if the person who he shot was dead but did not directly tell Thomas that he had committed the shooting. [T. 1145]. On redirect, Thomas clarified that he had only seen the holster and not the gun. [T. 1166-67].

Experts testified at trial that the shell casing found at the murder scene was fired from the pistol found in Thomas's garage attic. [T. 1170-1192]. Expert DNA analysis of swabs taken from various portions of the pistol and holster were compared to known standards from Bussey, Marquardt, Baccari, and the victim. [T. 1350-1388]. Petitioner's DNA was found to be the major DNA profile on the holster. [T. 1369]. Bussey's DNA profile was also found on the holster. [T. 1370]. The swab from the grip area revealed DNA from three individuals and Bussey and Petitioner could not be excluded. [T. 1372]. DNA from the hammer also could not exclude Bussey or Petitioner. [T. 1374]. DNA from the slide could not exclude Bussey or Baccari. [T. 1377]. Both Bussey and the victim's DNA were found on the decocker area of the gun. [T. 1382]. The swab of the trigger guard and trigger revealed that Petitioner and Bussey could not be excluded. [T. 1387].

Other than Petitioner's DNA on the holster, the DNA expert testified that she could not conclusively identify whose DNA was left on the gun. [T. 1388].

**Sergeant Prieschl ("Prieschl")** of the Palm Beach County Sheriff's Office testified that on the date of the murder, he arrived at the shooting location and canvassed the area. [T. 1434-36]. A shell casing was found at the scene, as well as, a gas station receipt and paperwork from the check cashing store. [T. 1440]. Through the victim's cellphone records, Petitioner was contacted on April 23. [T. 1446]. Baccari was located shortly thereafter on April 27, roughly two weeks after the incident. [T. 1447]. Both Baccari and Petitioner gave recorded statements to the police, portions of which were played for the jury. [T. 1447-1508].

**Officer McCann ("McCann")** from the Palm Beach Sheriff's Office analyzed the cellphone records near the time of the incident. [T. 1601-1656]. The records showed that Baccari called Petitioner's cellphone twice within a minute at 5:55 p.m. on April 14. [T. 1651]. The records also showed that a call was made from Petitioner's phone to Baccari's around the same time. [T. 1652]. The call, however, only lasted two seconds probably because Petitioner tried to call Baccari at the same time Baccari called him, and the call went to voicemail. [*Id.*].

After the State rested [T. 1673], counsel moved for judgment of acquittal on the basis that the State failed to prove that Petitioner had any intent to participate in a robbery and further failed to provide evidence to exclude Petitioner's reasonable hypothesis of innocence. [T. 1674-77]. Particularly, counsel argued that the mere fact that a phone call was made from Baccari's phone to Petitioner's phone right before the murder does nothing to show that Petitioner had an intent to commit a robbery. [T. 1678]. The motion was denied. [T. 1692].

The defense called **Melvin Goodwin ("Goodwin")** as a witness. [T. 1728]. At the time of his testimony, Goodwin had been incarcerated in the Palm Beach County Jail for 15 months. [T.

1729]. Goodwin testified that during that time, he shared a cell with Bussey. [T. 1730-33]. Bussey told Goodwin he was the one that pulled the trigger. [T. 1735]. He also told Goodwin "he [was] in here because someone called the police on him, and he wishes that he would have killed them to prevent them from calling the police on him…" [T. 1735]. Bussey never mentioned any names. [T. 1736]. Goodwin also testified that Bussey had recently threatened him in the jail. [T. 1778-1783]. Both defendants then rested and the State did not call any rebuttal witnesses. [T. 1851].

## VI. Governing Legal Principles

A. <u>Standard of Review</u>

The Court's review of a state prisoner's federal habeas corpus petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Abdul–Kabir v. Quarterman,* 530 U.S. 233, 246 (2007); *see also Ledford v. Warden, Ga. Diagnostic & Classification Prison,* 818 F.3d 600, 642 (11th Cir. 2016). AEDPA ensures that federal habeas corpus relief works to "guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." *See Greene v. Fisher,* 565 U.S. 34, 38 (2011). This standard is both mandatory and difficult to meet. *See White v. Woodall,* 572 U.S. 415, 420 (2014).

Deferential review under § 2254(d) is generally limited to the record that was before the state court that adjudicated the claim on the merits. *See Cullen v. Pinholster,* 563 U.S. 170, 182 (2011); *see also Gill v. Mecusker*, 633 F.3d 1272, 1288 (11th Cir. 2011). To review a federal habeas corpus claim, the Court must first identify the last state court decision, if any, that adjudicated the merits of the claim. *See Marshall v. Sec'y, Fla. Dep't of Corr.,* 828 F.3d 1277, 1285 (11th Cir. 2016). The state court is not required to issue an opinion explaining its rationale, because even the summary rejection of a claim, without explanation, qualifies as an adjudication on the merits that warrants deference. *See Harrington v. Richter,* 562 U.S. 86, 100 (2011); *see also*

*Ferguson v. Culliver,* 527 F.3d 1144, 1146 (11th Cir. 2008). Where the state court's adjudication on the merits is unaccompanied by an explanation, federal courts must "look through the unexplained decision to the last related state-court decision that does provide a rationale" and, "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. ___, 138 S. Ct. 1188, 1192 (2018). Thus, if the relevant state-court decision on the merits is not accompanied by a reasoned opinion, because it was summarily affirmed or denied, a federal court "should 'look through' the unexplained decision to the last state-court decision that does provide a relevant rationale." *Id.*

Where the claim was "adjudicated on the merits," in the state forum, § 2254(d) prohibits re-litigation of the claim unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or, (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Harrington,* 562 U.S. at 97-98.

A state court decision is "contrary to" established Supreme Court precedent when it (1) applies a rule that contradicts the governing law set forth by the Supreme Court; or (2) confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law is different from an incorrect application of federal law. *See id.* at 410. Consequently, "[a] state court's determination that a claim lacks merit precludes federal habeas corpus relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Mitchell v. Esparza,* 540 U.S. 12, 16 (2003); *see also Tharpe v. Warden,* 834 F.3d 1323, 1337 (11th Cir. 2016).

14

In other words, if the last state court to decide a prisoner's federal claim provides an explanation for its merits-based decision in a reasoned opinion, "a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson,* 138 S. Ct. at 1192. As applied here, to the extent Petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under § 2254(d).

B. <u>Ineffective Assistance of Counsel Standard</u>

Here, Petitioner raises multiple claims challenging counsel's effectiveness. The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the assistance of counsel during criminal proceedings against them. *See Strickland v. Washington,* 466 U.S. 668, 684–85 (1984). When assessing counsel's performance under *Strickland,* the Court employs a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. A § 2254 petitioner must provide factual support for his contentions regarding counsel's performance. *See Smith v. White,* 815 F.2d 1401, 1406–7 (11th Cir. 1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the *Strickland* test. *See Boyd v. Comm'r, Ala. Dep't of Corr.,* 697 F.3d 1320, 1333–34 (11th Cir. 2012).

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt v. Titlow,* 571 U.S. 12, 20 (2013). "Where the highly deferential standards mandated by *Strickland* and the AEDPA both apply, they combine to produce a doubly deferential form of review that asks only 'whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *Gissendaner v. Seaboldt,* 735 F.3d 1311, 1323 (11th Cir. 2013).

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that: (1) his counsel's performance was deficient, falling below an objective standard of reasonableness; and, (2) he suffered prejudice resulting from that deficiency. *See Strickland,* 466 U.S. at 687-88. Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. *See id.* at 690-91. To uphold a lawyer's strategy, the Court need not attempt to divine the lawyer's mental processes underlying the strategy, because there are "countless ways to provide effective assistance in any given case." *Id.* at 689.

To establish deficient performance, the movant must show that, in light of all circumstances, counsel's performance was outside the wide range of professional competence. *See id.*; *see also Cummings v. Sec'y for Dep't of Corr.,* 588 F.3d 1331, 1356 (11th Cir. 2009). The Court's review of counsel's performance should focus on "not what is possible or what is prudent or appropriate but only [on] what is constitutionally compelled." *Chandler v. United States,* 218 F.3d at 1313; *see also Burger v. Kemp,* 483 U.S. 776 (1987). Counsel is not ineffective for failing to raise non-meritorious issues, *see Chandler v. Moore,* 240 F.3d 907, 917 (11th Cir. 2001), nor is counsel required to present every non-frivolous argument. *See Dell v. United States,* 710 F.3d 1267, 1282 (11th Cir. 2013).

Regarding the prejudice component, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* the Court need not address both prongs of *Strickland* if the defendant makes an insufficient showing on one of the prongs. *See id.* at 697; s*ee also Brown v. United States,* 720 F.3d 1316, 1326 (11th Cir. 2013).

**VII. Discussion**

16

In **claim 1**, Petitioner argues that his lawyer was ineffective at trial for failing to ensure the jury was instructed on the offense of manslaughter. [ECF No. 1 at 5-6]. Review of Petitioner's appellate brief regarding his Rule 3.850 motion reveals that he challenged the trial court's summary denial of his claim on appeal. [ECF No. 17-1, Ex. 19 at 371]. As such, the issue was fairly presented to the state court on collateral review and is therefore exhausted. *See Castille,* 489 U.S. at 351. However, because there is no reasoned decision for the Court to examine under a deferential standard of review, *see Wilson*, 138 S. Ct. at 1194, the Court examines Petitioner's claim under a *de novo* standard of review. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (explaining that judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner and the procedural bar issues are complicated).

As discussed above, Petitioner, along with his co-defendant Baccari, was charged with first degree felony murder for killing the victim during the "commission or attempt to commit any offense listen in Fla. Stat. § 775.087(2)(a)1." (charged as Count 1 in the Indictment). [ECF No. 17-1, Ex. 1]. The offense that Petitioner was charged with committing during the murder was robbery with a firearm, in violation of Fla. Stat. § 812.13(1) and (2)(a) (charged as Count 2 in the Indictment). [*Id*.].

When reviewing the proposed jury instructions, counsel explicitly requested a "mere presence" instruction under Florida law based on his theory of defense that he had no knowledge that his co-defendant(s) planned to commit a robbery, and was merely present in the vehicle when the robbery and murder were committed. [T. 1224]. Counsel made it clear that he wanted minimal instructions to the jury. [T. 1260-1264]. He never expressly requested a manslaughter instruction and told the judge that the only lesser offenses he was requesting were "those that are mandatory lessers pursuant to the Florida rules." [T. 1260]. The court then followed up, asking "[s]o if the

State wants no lesser, you want no lessers?" to which counsel responded "[c]orrect." [T. 1260-61]. The State went on to request instructions on the lesser included offenses of second-degree murder with a firearm, and third-degree murder with a firearm. [T. 1261]. Counsel then stated that in his later motion for judgment of acquittal he would argue that the facts of the case do not support the giving of the lesser instructions requested by the State. [T. 1262]. Counsel later stood silent when the court asked if either party wanted a manslaughter instruction. [T. 1275].

Review of the record above demonstrates that counsel, as a matter of strategy, opted not to include lesser included offenses in the jury instructions. A manslaughter instruction would have been inconsistent with counsel's "mere presence" theory. In pertinent part, the evidence presented at trial was that Baccari met with the victim with the intention of committing a robbery. During the felony, Baccari shot the victim with a firearm. Petitioner drove the getaway car. Manslaughter, under Florida law, is the killing of a human being without lawful justification when such killing is not "excusable homicide or murder." Fla. Stat. § 782.07.  Counsel's mere presence theory hinged on whether Petitioner had knowledge of Baccari's (or Bussey's)[3] intent to commit the robbery, not on the premise that Baccari's (or Bussey's) killing of the victim did not constitute murder. Nothing provided by the Petitioner suggests that his counsel's decisions concerning jury instructions were based upon anything other than trial strategy. In light of the evidence presented, counsel's strategic decision was reasonable. *See Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (*en banc*); *see also Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983). Accordingly, Petitioner fails to demonstrate that counsel's performance was deficient under the first prong of *Strickland.*

---

[3] As discussed above, Bussey testified that Baccari shot the victim. Counsel, however, argued that the forensic evidence showed that Bussey was the one that pulled the trigger.

Further, Petitioner fails to demonstrate that the result of the proceedings would have been any different had counsel requested a manslaughter instruction. Petitioner's contention that he would have been convicted of the lesser included offense is pure speculation and does not undermine the Court's confidence in the outcome of his criminal proceeding. *See Harris v. Crosby*, 151 F. App'x 736, 738 (11th Cir. 2005). The jury found that the evidence presented at Petitioner's trial was sufficient to sustain a conviction for first degree felony murder and robbery with a firearm. Therefore, even assuming, without deciding, that counsel was deficient for failing to request or otherwise ensure that jury instructions on lesser included offenses were given, that deficiency does not suggest that there was a reasonable probability that the outcome would have been different. *See Strickland*, 466 U.S. at 693–94 (explaining that a reviewing court should presume that the jury acted according to law). Accordingly, claim 1 should be denied.[4]

In **claim 2**, Petitioner alleges that his lawyer was ineffective when he failed to impeach Antonio Bussey with co-defendant Baccari's phone records and/or "Gas One" video and photos. [ECF No. 1 at 7]. Petitioner submits that this impeachment evidence would have undermined Bussey's testimony as the State's main witness. [*Id*.]. This claim is exhausted.

Petitioner raised this claim in his Rule 3.850 motion. [ECF No. 17-1, Ex. 15 at 238]. In response to Petitioner's claim, the State asserted the following:

> The defendant alleges that counsel should have used cell phone records and photos taken at a gas station to impeach Bussey on his testimony concerning where co-defendant Baccari was when he called the defendant, prior to the murder. However, the cell phone records and photographs from the gas station essentially establish that the defendant was with Bussey and Baccari at the time and place of the murder. Since those items actually supported the State's theory, counsel's decision to not employ them during cross does not demonstrate deficient performance. Nor can the defendant establish prejudice as there is not reasonable probability that had counsel

---

[4] To the extent that Petitioner means to argue that his rights were violated because a manslaughter instruction is mandated under Florida law, such a claim is addressed below in claim 13.

impeached the defendant in this manner, that the outcome of the case would have been different.

[ECF No. 17-1, Ex. 17 at 299-300]. The trial court then denied the claim for the reasons set forth in the State's response. [ECF No. 17-1, Ex. 18].

As discussed above, Detective McCann testified as to the phone records from before 6 p.m., the approximate time of the murder.  [T. 1649]. Bussey testified that after Petitioner picked him up, they drove to a gas station. [T. 848].  Bussey stated that no one got out of the car to go into the gas station, and they were stopped for about a minute. [T. 848-849]. During this minute, Baccari and Petitioner agreed that Baccari would call Petitioner while talking to the victim to dupe him into believe that the Petitioner would bring drugs. [T. 852]. After they left the gas station and arrived at the scene of the eventual murder, Baccari got out of the car to talk to the victim, who was sitting in his truck. [T. 854-55]. During the "couple of minutes" when Baccari was talking to the victim through the driver's side window of the victim's car, Petitioner's phone rang. [T. 855].

Petitioner now claims that the Gas One video shows that Baccari was not in his vehicle at the gas station, and that the multiple phone calls between the two of them around the time of the murder show that they were not in the same vehicle when they left the gas station, directly contradicting Bussey's testimony. [ECF No. 1 at 8]. Specifically, the phone records provided by Petitioner in his appendix [ECF No. 5] show that Baccari called Petitioner at 5:51:12 p.m., 5:54:42 p.m., 5:55:25 p.m., and 5:55:53 p.m., just before the murder occurred. [*Id*. at 5]. Petitioner then called Baccari at 5:55:55 p.m., 5:56:15 p.m., 5:56:51 p.m. and 5:58:38 p.m. [*Id*.].

While counsel did not direct cross-examine Bussey on the phone records or video, he did present a thorough cross-examination at trial. [T. 901]. He impeached Bussey with his previous contradictory statements to law enforcement. [T. 907].  Specifically, Bussey admitted that he told police had had not touched a gun since he was a juvenile, which directly contradicted his testimony

at trial that he touched Petitioner's gun after the incident. [T. 908]. Counsel also cross-examined Bussey regarding questionable facts about his account of the incident, including, but not limited to: (1) he asked Petitioner for money even though they were only "associate[s]" [T. 917-18]; (2) Petitioner picked Bussey up in the "late morning," and they were together for around 45 minutes, even though the murder did not occur until around 6 p.m.[5] [T. 919-921]; (3) Bussey never heard anyone say anything about a robbery [T. 932]; (4) he knew how they got to Thomas Marquardt's house even though he had never been there before [T. 937]; (5) he told police he wasn't scared of Petitioner even though he testified to the contrary at trial, and left a threatening voicemail message on Petitioner's phone the night before his arrest [T. 946-49]; and, (6) he pled guilty to murder even though he testified at trial that he was merely present during the incident [T. 981].

Counsel also thoroughly cross-examined Bussey about his plea agreement. [T. 982]. Bussey admitted that he pled guilty and accepted a 21-year plea because 21 years sounded better to him than life in prison. [*Id.*]. Bussey also acknowledged that as part of the plea agreement, he agreed to testify consistent with his statement on direct examination, and that if he failed to testify, he would be in violation of his plea agreement. [*Id.*]. If in violation of his plea agreement, Bussey recognized that the case against him would be reopened and he would be accused of first-degree murder with a firearm. [T. 983]. Bussey denied admitting to being the shooter while he was housed at the Palm Beach County Jail. [T. 986].

To further impeach Bussey's testimony, counsel called Bussey's cellmate, Melvin Goodwin, who stated that Bussey admitted to being the shooter and told Goodwin he wished he would have killed Baccari and Bussey to prevent them from calling the police on him. [T. 1735].

---

[5] On cross, Bussey testified that the murder happened around 12 p.m. [T. 925]. However, all the other evidence supported the claim that the murder happened around 6 p.m.

Counsel further highlighted the inconsistencies in Bussey's testimony in closing argument to establish that he was not a credible witness. [T. 1973, 1978-79, 1982-83, 1989]. In closing, counsel argued that Bussey's statement that Baccari was the shooter was completely inconsistent with the physical evidence which showed Bussey's DNA on the gun's trigger guard. [T. 2006].

In his co-defendant's closing argument, co-defendant's counsel highlighted the discrepancies between the surveillance video and Bussey's testimony. Specifically, he said "[o]ne of the things that [Bussey] said is that Baccari was never with [the victim] prior; that they all went there in [Petitioner's] truck together. Well that's not what happened…Looking right here, and you're going to see Baccari inside of the Gas One station where he met John." [T. 2055-56].

Still, despite these arguments and counsel's thorough cross-examination, the jury found Petitioner guilty. There is, therefore, no reasonable likelihood that even if evidence of the video and phone calls had been highlighted to the jury to show the discrepancy between the evidence and Bussey's testimony, that Petitioner would have been acquitted. Accordingly, the state court's resolution of this claim is entitled to deference under § 2254(d) and claim 2 should be denied.

In **claim 3**, Petitioner alleges that he received ineffective assistance of counsel when his lawyer failed to properly examine the "Gas One" video evidence which proved that it was redacted. [ECF No. 1 at 9]. Specifically, he claims that he could have presented the theory that the prosecution placed "skips" in the Gas One video in order to falsely corroborate Bussey's testimony. [*Id*. at 10]. Had counsel pointed out these "lengthy skips" to the jury, Petitioner alleges that the outcome at trial would have been different. [*Id*.].

Respondent asserts that this claim is unexhausted because Petitioner failed to raise the claim in the context of prosecutorial misconduct in his Rule 3.850 Motion. [ECF No. 16 at 24]. In his Rule 3.850 motion, Petitioner argued that his lawyer was ineffective for failing to use the Gas

One video to support Petitioner's statement about what happened, including his allegation that Baccari left the gas station in the victim's, rather than Petitioner's, truck. [*Id.*]. This claim is materially different from the prosecutorial misconduct claim raised here, where Petitioner alleges the gaps in the video were made intentionally by the prosecutor. Petitioner presents no good cause for his failure to properly exhaust this claim in State court. Accordingly, Petitioner's prosecutorial misconduct claim is procedurally defaulted from review. *See Bailey v. Nagle,* 172 F.3d 1299, 1302-03 (11th Cir. 1999); *see also Wainwright v. Sykes,* 433 U.S. 72, 87 (1977)

Nevertheless, to the extent that Petitioner argues that his lawyer was ineffective for failing to use the video in his defense, irrespective of his prosecutorial misconduct allegation, such a claim is exhausted, as Petitioner raised it in his Rule 3.850 Motion. [ECF No. 17-1, Ex. 16]. In responding to the claim, the State argued the following:

> Here, the defendant's claim is based upon hindsight and lacks merit. To the extent that the defendant argues that counsel should have relied upon the Gas One videotape, the State adopts and incorporates its argument in Ground Four above. Video-recordings and photographs from the gas station actually establish that the defendant was with Bussey and Baccari near the time and place of the murder.
>
> Contrary to the defendant's assertion, counsel presented a strong theory of defense at trial. The record shows that defense counsel's theory of defense was that the State could not and did not prove its case beyond a  reasonable doubt as the evidence showed that the defendant, a landscaper, was merely assisting the codefendants with employment on the date in question. Accordingly, the defendant did not have any knowledge of the codefendants' plan to commit robbery and did not have any intention to commit robbery or murder. Defense counsel emphasized that the evidence, including the DNA test results, established that Antonio Bussey was responsible for the crimes. Defense counsel called witness Melvin Goodwin to the stand and Goodwin testified that Bussey admitted that he pulled the trigger and killed someone. (Exhibit "AA", Trial Transcript, Excerpt, Testimony of Goodwin, pp. 1734-36). Counsel competently presented a strong opening statement, rigorously cross examined Antonio Bussey and presented a strong closing argument. (See Exhibit "BB," Opening Statement, Exhibit "S", Transcript of Bussey's Trial Testimony; Exhibit "CC", Closing Arguments). The defendant has failed to present any authority to support a conclusion that a decision to argue the State's failure to meet its burden of proof constitutes deficient performance. This claim should be denied,

[ECF No. 17-1, Ex. 17 at 307-08].

As discussed above in claim 2, although counsel did not discuss the Gas One videotape in the context of it supporting Petitioner's statement to police, his co-counsel did. [T. 2055-56]. He also thoroughly cross-examined Bussey regarding the inconsistencies between the evidence and his testimony on direct examination. Despite Bussey's thorough impeachment, the jury was unconvinced and found Petitioner guilty of felony murder. There is plainly nothing in the record to suggest that had counsel more heavily relied on the Gas One videotape in presenting his defense, the outcome at trial would have been different. Thus, Petitioner fails to demonstrate any prejudice under the second prong of *Strickland*.

Given the foregoing, the state court's resolution of the issues raised in claim 3 during Petitioner's state postconviction proceeding should not be disturbed here. *See* 28 U.S.C. § 2254(d); *see also Williams*, *supra*.

In **claim 4**, Petitioner alleges that his due process rights were violated when the prosecutor knowingly presented Bussey's false testimony in violation of *Giglio v United States*, 405 U.S. 150 (1972). [ECF No. 1 at 11]. Specifically, Petitioner alleges that when Bussey testified that he believed a robbery was occurring during the incident, the prosecutor knew that the testimony was false because Bussey had previously said in a sworn statement that he didn't know it was a robbery. [*Id*. at 12]. Petitioner asserts that this testimony was material because the only way the jury could convict Petitioner of first-degree felony murder was if the victim was killed during the course of a robbery, not a drug deal. [*Id.* at 13].

When Petitioner raised this claim in his Rule 3.850 Motion, the State responded by arguing the following:

> The defendant alleges that the prosecutor knowingly presented false testimony of Antonio Bussey. The United States Supreme Court in <u>Giglio v. United States</u>, 92

S. Ct. 763 (1972), prohibits a prosecutor from knowingly presenting false testimony against a defendant. To prove a Giglio violation, "a defendant must show that: (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material." See Tompkins v. State, 994 So.2d 1072, 1091 (Fla. 2008). The defendant fails to demonstrate that the prosecutor knowingly presented false evidence. Significantly, in his sworn pretrial testimony, Bussey stated that he heard the victim say give me my pills or give me my money and the sound of gunfire. (Exhibit "T", Bussey's Sworn Statement, pp. 55-59).

Defense counsel objected to Bussey's testimony arguing that this was the first time he stated that this was a robbery. (Exhibit "S", Excerpt of Trial Transcript, Antonio Bussey Argument pp. 892-900). The prosecutor pointed out that in the prior statements, no one asked Bussey what he thought was going on after Baccari got out of the car and approached the victim. Id. The Judge sustained the objection and told counsel he had wide latitude in cross examination. Id. Defendant's counsel thoroughly crossed Bussey on his prior statements wherein he denied that it was a robbery. (Exhibit "S", Excerpt of Trial Transcript, Antonio Bussey, pp. 930-934). Bussey admitted that he never heard the defendant or co-defendant Baccari discuss a robbery. Id. During co-defendant's cross, Bussey admitted that the defendant never said anything about "busting a lick." (Exhibit "S". Excerpt of Trial Transcript, Antonio Bussey, p. 1004).

In light of the totality of the record, the defendant fails to demonstrate that Bussey's testimony was false. Therefore, the defendant fails to establish the first two prongs of Giglio, supra. Even if the defendant could establish the first two Giglio prongs, the testimony was not material as there is no reasonable possibility that it could have affected the jury's verdict. Tompkins, at 1091. In light of the strong evidence of the defendant's guilt under either the principal or felony murder theory, there is no reasonable probability that Bussey's testimony that he thought it was a robbery after co-defendant approached the victim, could have affected the outcome of this case. This is particularly true in light of defense counsel's cross examination of Bussey which shattered his credibility.

Further, contrary to the defendant's allegations, the State's evidence was not limited to Bussey's testimony. It was undisputed that the defendant drove himself and the co-defendants to meet the victim. The gun used to kill the victim was linked to the defendant through police records and the testimony of defendant's uncle, Thomas Marquardt. (Exhibit "U"), Excerpt of Trial Transcript, Testimony of Officer Rodriguez, pp. 753-5; Exhibit "V" Excerpt of Trial Transcript, Testimony of Thomas Marquardt). Cell phone records showing that the defendant calling Baccari's phone within a minute of the murder corroborated Bussey's testimony that the defendant participated in the robbery by calling Baccari. (Exhibit "W", Excerpt of Trial Transcript, Testimony of Officer Tim McCann, p. 1651).

After the murder, the defendant sped away from the scene and parking his truck at his uncle's home, claiming the truck needed brake work. (Exhibit "V", Excerpt of

Trial Transcript, Testimony of Thomas Marquardt, pp. 1006-8). While giving the men a ride, the defendant told his uncle that "we just killed somebody." Id. A few days later, the defendant returned to his uncle's home with the murder weapon and hid it in the attic garage. Id. Cell phone records also showed the defendant and co-defendant Baccari exchanged numerous phone calls in which they may have plotted to pin the murder on Bussey. (Exhibit "W", Excerpt of Trial Transcript, Testimony of Officer Tim McCann). Accordingly, these claims are conclusively refuted by the record and should be denied.

[ECF No. 17-1, Ex. 17 at 300-302]. In denying Petitioner's Rule 3.850 motion, the court adopted the State's response as its own findings of fact and conclusions of law. [ECF No. 17-1, Ex. 18].

In *Giglio*, the Supreme Court held that when the prosecution solicits or fails to correct known false evidence, due process requires a new trial where "the false testimony could in any reasonable likelihood have affected the judgment of the jury." 405 U.S. at 154. "To establish a *Giglio* claim, a habeas petitioner must prove: (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, i.e., that there is any reasonable likelihood that the false testimony could have affected the judgment." *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1348 (11th Cir. 2011) (quotations marks and ellipsis omitted).

In Bussey's deposition, he testified that he assumed a drug deal was occurring, and that there was a possibility that someone was "fixing to bust a lick." [ECF No. 5-1 at 12]. Bussey also stated that "bust a lick doesn't necessarily mean a robbery," he couldn't say that it was a robbery, and that he didn't "know [Petitioner] for nothing like that." [*Id*. at 13]. During the deposition, however, this testimony related to Bussey's belief about what was occurring prior to Baccari walking back to the truck. [*Id*.]. In fact, Bussey went on to state in his deposition that when Baccari began to walk back to the truck, the victim jumped out of his car, and said "give my [sic] the money back or give me some pills." [*Id*.]. This testimony was not directly inconsistent with Bussey's testimony that he believed a robbery was occurring after the planned phone call between

26

Baccari and Marquardt. As asserted by the prosecutor at trial, no one asked Bussey in deposition what he though was happening later on during the incident. [T. 897]. In light of the record, having failed to establish that Bussey's testimony was, in fact, "perjured," Petitioner cannot demonstrate that the prosecutor knowingly presented this "false" testimony. The fact that the Petitioner takes issue with Bussey's testimony does not mean that such testimony was untruthful or a product of misconduct on the part of the state.[6]

Moreover, Petitioner fails to demonstrate any reasonable likelihood that this "false" testimony could have affected the verdict in his case. Bussey was subjected to thorough cross examination by defense counsel regarding his credibility, the reliability of his testimony, and his motive for testifying. In fact, as discussed throughout this report, defense counsel conducted a thorough and forceful cross examination of Bussey. It is apparent from careful review of the record that the jury rejected the defense presented and, instead, believed the state's theory and evidence presented by the State, as was its prerogative. Thus, Petitioner is not entitled to relief on his *Giglio* claim. Therefore, the state court's rejection of the claim should not be disturbed here. *See Williams*, *supra*.

In **claim 5**, Petitioner alleges that his lawyer was ineffective when he misadvised him regarding his likelihood of success at trial, which resulted in him rejecting a 15-year plea agreement. [ECF No. 1 at 13]. He specifically claims that his lawyer misadvised him that based on the facts of the case, he could not be convicted of robbery with a firearm and murder. [*Id*.]. He also contends that his lawyer never explained to him the law on principal theory or felony murder. [*Id*.]. Finally, Petitioner alleges that counsel did not adequately advise him because he only told

---

[6] In his Reply, Petitioner suggests the state court's finding that Bussey believed a robbery was occurring was not material was erroneous because it was based on the incorrect premise that Bussey's testimony was corroborated by Baccari's phone records. [ECF 28, p. 7]. As discussed above, Petitioner fails to demonstrate that Bussey's testimony was indeed, false. Thus, the Court is not required to determine whether this allegedly "false" testimony was material.

him on the date of trial, even though he knew about the offer months before. [*Id.* at 14]. Had counsel properly advised him, Petitioner asserts that he would have pled guilty and accepted the 15-year plea offer. [*Id*. at 14].

Petitioner raised this claim in his Rule 3.850 motion. [ECF No. 17-1, Ex. 15]. In response, the State argued as follows:

> Where a defendant alleges that his attorney provided ineffective assistance that caused him to reject a favorable plea, prejudice is shown by establishing: (1) that he would have accepted the offer had he been correctly advised; (2) that the prosecutor would not have withdrawn the offer; (3) that the court would have accepted the offer's terms; and (4) that the sentence under the terms of the offer was less severe than the sentence ultimately imposed. <u>See Alcorn v. State</u>, 121 So. 3d 419 (Fla. 2013).

> The State submits that the defendant's claim lacks credibility. It is not reasonable to believe that in a first-degree murder case, counsel never told the defendant that he was being tried as a principal or for felony murder. Notably, the defendant was indicted for Robbery with a Firearm, a felony offense, and discovery showed that shortly before the murder, the victim obtained a $500.00 cash advance against his paycheck. However, after the victim was killed by gun fire, officers never recovered $500.00 from the victim's person, property or vehicle. (Exhibit "A", Indictment; Exhibit "Y", Affidavit and Application for Search Warrant).

> Further evidence of the lack of credibility of the defendant's claim is found in the initial pages of the trial transcript. Specifically, prior to voir dire, and prior to the colloquy regarding the State's plea offer, the Court and the defendant's counsel discussed felony murder in the defendant's presence:

> *THE COURT: ... Good morning. And let me call up the State of Florida versus Louis Baccari and Michael Marquardt. And let me note for the record that both defendants are present here in the courtroom and dressed up for trial. We're here for-to begin a jury trial. . . . Mr. Skier, you wanted to bring up a couple of issues before we brought the panel in.*

> ****

> *MR. SKIER: The State is under no obligation to provide the defense with notice of a felony theory. You understand that pursuant to case law. However, I can anticipate potentially, that that is the theory of the prosecution on a felony theory, meaning that there is some other illegal act not charged that escalated to the extent that a homicide resulted from it"*

> (Exhibit "X", Excerpt, Trial Transcript, p. 3) (emphasis supplied).

Prior to the Court's plea offer colloquy, the principal theory was also discussed in the defendant's presence:

*MS. COLLINS: It's [accessory after the fact] a charge in the alternative. The jury -- because there's – it's a whole muddle of facts. And the way that it was indicted it means that it could be in the alternative.*

*THE COURT: Okay. So if they--*

*MS. COLLINS: (Inaudible) if they believe that they didn't know the robbery -for, example, to use a, you know, a getaway driver type thing.*

*THE COURT: Right.*

*MS. COLLINS: In an armed robbery, that maybe they didn't know the robbery was happening.*

*THE COURT: Right.*

*MS. COLLINS: But after it happened and they get in the car and drive away they may not be guilty of principal but they could be guilty of accessory after the fact.*

(Exhibit "X", Excerpt, Trial Transcript, pp. 7-8) (emphasis supplied)

In the face of the felony murder and principal discussions, the defendant remained silent. The record shows that those theories were discussed in further detail during jury selection. Regarding felony murder, the prosecutor stated:

*Now count one is the charge of murder. And most people think of murder in a certain way, you know, that somebody, you know, plans to go out and shoot someone or stab someone or poison someone. But in the State of Florida there's actually two ways to prove first degree murder. One way is premeditated which I kind of talked about and you see on television a lot. And the other way is something known as felony murder. Has anyone heard of that term, felony murder?*

(Exhibit "Z", Excerpt, Trial Transcript, pp. 136, 137) (emphasis supplied)

As to the law of principals the prosecutor stated:

*MS. COLLINS: ... It's something in the State of Florida principles. And what it means is that if, again, we're going into a bank and we're robbing a bank, and I get all the schematics for the bank and I can tell you, you know, when the door's gonna open on the safe and where all the -- where all the bank players work and where the buttons are to push for the police and – 'cause I work there and I provide all the plans but I don't go. And then there's someone else who works as the getaway driver and they're gonna drive the car and they're gonna have the car waiting outside. Then there's two other people who go in. And as the Court said, you know, the guard shoots an innocent bystander. The law of principle says that if I provided*

*all the schematics and I provided all the details and I knew there was gonna be a bank robbery that I can be held accountable for what other people do. I can be held accountable for the robbery. I can be held accountable for the murder. I can be held accountable for -- everyone though I didn't go inside, okay that's called the law of principals.*

(Exhibit "Z", Excerpt, Trial Transcript, pp. 148, 149) (emphasis supplied)

Significantly, the Court explained the theory of felony murder:

*THE COURT: Ms. Collins hinted that felony murder is any death -- the State can prosecute first degree murder two different                    ways. They can prosecute it by saying, we accuse somebody of committing a premeditated murder, and that's what everybody thinks about. I want to go kill that guy. I go buy the poison. I sprinkle his food. I intend to kill him, and he dies. And so that's premeditated murder.*

*Felony murder is, an example of that, would be if three of us go in to rob a bank and the guard -- and we've got our guns and we say everybody - you know, but they're empty. They're blank guns. We really don't want to kill anybody. But we go in and we wave our guns around, and the security guard pulls out a gun and shoots one of my accomplices or shoots an innocent bystander by accident, the people who agree to participate in the robbery could be brought to trial for felony murder. They didn't actually commit the murder but they set in play the series of events that caused the murder. They agreed to commit a felony and in the course of that felony somebody got murdered. That's an example of where you can prosecute somebody for felony murder.*

(Exhibit "Z", Excerpt, Trial Transcript, pp. 146-147) (emphasis supplied).

Accordingly, the felony murder and principal theories were explicitly discussed in the defendant's presence. The State submits, therefore, that the defendant's silence indicates that he was aware that he was facing trial as a principal and for felony murder as well as premeditated murder. It is well settled that a post conviction movant cannot disown knowledge of the obvious. Capalbo v. State, 73 So. 3d 838 (Fla. 4th DCA 2011). Likewise, a post conviction court is not required to hold hearings on absurd claims or accept as true allegations that defy logic and which are inherently incredible. Id.

Significantly, at no point during trial, or at the sentencing hearing, did the defendant complain that he did not understand that he could be convicted of first degree murder with a firearm as a principal under the felony murder theory and that he would have accepted the State's plea offer had he known. (Exhibit "F", Sentencing Transcript). Accordingly, this claim should be denied as the defendant has failed to meet the Standards as pronounced in Strickland.

[ECF No. 17-1, Ex. 17 at 302-306].

The law is well settled that defense counsel has an affirmative duty, under the Sixth Amendment, to provide competent advice, and to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to an accused. *See Missouri v. Frye,* 566 U.S. 134, 140-141 (2012); *see also Lafler v. Cooper,* 566 U.S. 156, 162-63 (2012) (citations omitted). The *Strickland* framework applies to advice regarding whether to plead guilty or proceed to trial. *See Lafler*, 566 U.S. at 162-63 (quoting *Hill v. Lockhart*, 474 U.S. 52, 57-59 (1985)).

While the analysis of *Strickland*'s performance prong is the same, in *Lafler,* the Supreme Court explained that, to prove *Strickland* prejudice, a petitioner is required to demonstrate that the outcome of the plea process would have been different with competent advice. *See Lafler*, 566 U.S. at 162-63; *see also Frye,* 566 U.S. at 146. To prevail, a petitioner "must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id.* at 163.

Where a defendant was aware of the plea offer, was fully informed of the nature of the charges and potential sentences, and did not object to its rejection, his claim of ineffective assistance of counsel regarding the plea offer fails. *See Diaz v. United States*, 930 F.2d 832, 834-35 (11th Cir. 1991); *see also Scott v. United States*, 325 F. App'x 822, 824 (11th Cir. 2009). Furthermore, the defendant's mere allegation that he or she would have plead guilty, although necessary, is ultimately insufficient to warrant relief. *See Cook v. United States*, 189 F. App'x 927, 932 (11th Cir. 2006) (defendant's after-the-fact assertion, standing alone, insufficient to establish that defendant would have accepted plea offer).

31

Here, both Movant's counsel and the Court expressly informed him of the 15-year plea offer. Counsel acknowledged that he had not conveyed the offer prior to trial, because it wasn't clear that it was a "firm offer." [T. 9]. The Court then questioned Movant regarding the plea, and specifically told him that if the jury found him guilty, he could be given more than 15 years, and that he could not then go back and say that he wished to take the plea. Petitioner decided to proceed to trial knowing that there was no guaranteed outcome. Petitioner was advised of the fifteen-year plea offer, and expressly rejected it on the record. [T. 11-12]. It is clear that the offer was conveyed to Petitioner and that he knowingly rejected it.

Moreover, nothing in the record suggests that Petitioner did not know that he would be tried under a principal theory. Rather, as discussed in the State's response to his Rule 3.850 motion, the principal theory and felony murder were discussed on multiple occasions throughout the trial. [T. 8, 138, 141, 147s]. His claim now that he was misadvised or that he did not know about felony murder or principal theory is without evidentiary support in the record.

Thus, nothing in the record supports a finding that Petitioner was misadvised by counsel to reject the state's plea offer. Petitioner has not met his burden of proof, having failed to demonstrate that counsel's purported deficiencies resulted in prejudice under *Strickland.* Therefore, relief is not warranted on this claim, and the rejection of the claim in the state forum should not be disturbed here. *See Williams*, *supra.* Claim 5 should be denied.

In **claim 6**, Petitioner alleges that trial counsel was ineffective for failing to file a post-trial motion for arrest of judgment and/or a motion for judgment of acquittal. [ECF No. 1 at 14]. Specifically, he claims that because the jury concluded that Bussey was the shooter, even though he was not named in the indictment, he could not be convicted as a principal to Bussey. [*Id*. at 15]. Based on the jury's findings that Baccari, his co-defendant, did not use a firearm during the

commission of the crime, Petitioner argues that counsel should have filed a post-trial motion for

judgment of acquittal pursuant to Fla. R. Crim. P. 3.380(c). [*Id.*].

When responding to this claim in Petitioner's Rule 3.850 Motion, the State argued as

follows:

> The defendant's allegations do not warrant relief. It must be recognized that the
> defendant essentially raised this claim in Issue Two of his Petition for Writ of
> Habeas Corpus when asserting that appellate counsel was ineffective for failing to
> present this argument on direct appeal. (Exhibit "J", Petition). The State, as
> represented by the Office of the Attorney General, fully addressed the merits of this
> issue in its Response to Order to Show Cause. (Exhibit "J", Response). Specifically,
> the State noted that the interrogatory on the verdict form regarding Baccari's
> possession of the firearm would have been used solely for 10-20-Life sentencing
> enhancement. The State argued, in part, that the defendant failed to:
>
> *…acknowledge that it is undisputed that the victim of the murder was shot in the*
> *heart. Obviously, the gunshot through the heart shows that the robbery was*
> *committed with a firearm. Since the petitioner was prosecuted on a principal*
> *theory, it does not matter what the jury found regarding Bacarri possessing the*
> *firearm in the special interrogatory-the victim was shot with a firearm.*
> *Additionally, it was undisputed at trial that the firearm, used to kill the victim was*
> *owned by the petitioner and petitioner was in possession of the weapon both before*
> *and after the murder and petitioner personally helped hide the firearm. The answer*
> *to the interrogatory in Baccari's case could have been the result of a jury pardon*
> *or a belief by one of more of the jurors that Bussey (who had earlier entered a plea)*
> *was the one who possessed the firearm at the time it was fired. Under the facts*
> *presented here…the issue simply had no merit.*
>
> (Exhibit "J["], Response to Order to Show Cause).
>
> Notably, the Fourth District Court denied the defendant's petition on January 25,
> 2016. (Exhibit "J", Order). The State adopts and incorporates the argument from
> the Response to the Order to Show Cause into this pleading to support the
> conclusion that the filing of post trial motions for judgment of acquittal and arrest
> of judgment would have been meritless and thus denied.

[ECF No. 17-1, Ex. 17 at 309-311].

Under Fla. R. Crim. P. 3.610, a trial court shall grant a motion for arrest of judgment only

if (a) the indictment is so defective that it will not support a judgment of conviction, (b) the court

is without jurisdiction, or (c) the "verdict is so uncertain that it does not appear therefrom that the

jurors intended to convict the defendant…under the indictment or information under which the defendant was tried." Fla. R. Crim. P. 3.610(c). Under Fla. R. Crim. P. 3.380, a defendant may move for a judgment of acquittal after the jury returns a verdict of guilty if the "evidence is insufficient to warrant a conviction." Fla. R. Crim. P. 3.380(a) and (c).

Here, Petitioner fails to demonstrate that counsel was ineffective for failing to file a motion for arrest of judgment or motion for judgment of acquittal after the jury rendered its verdict. Although the jury did not find that Baccari possessed a firearm during the murder, contrary to Petitioner's representations, the jury never made a specific finding that Petitioner did not possess a firearm during the commission of the offense. [T. 2323]. Therefore, the jury did not find him guilty of a crime not charged in the indictment.

Moreover, there is nothing about the indictment itself that was defective, nor was there any indication from the verdict that the jury did not intend to find Petitioner guilty of first-degree murder with a firearm. Consequently, counsel cannot be deemed ineffective for failing to file a meritless motion with the trial court. *See Chandler*, 240 F.3d at 917,

Further, Petitioner cannot demonstrate any prejudice because he fails to establish sufficient facts to show a reasonable likelihood that the trial court would have granted such a motion. As discussed above, counsel moved for judgment of acquittal at the close of the state's evidence, but the court denied the motion, noting that he understood why the case was going to trial, but finding in the light most favorable to the State, there was sufficient evidence to establish a *prima facie* case. [T. 1691-92]. At the close of the defense case, counsel again renewed his motion for judgment of acquittal, and the court reserved ruling. [T. 1852]. Then, during sentencing, counsel moved for a new trial, arguing that the court erred by denying his motion for judgment of acquittal. [T. 2344, 2350]. The court denied the request, noting that the "law is on the side of the State." [T. 2357].

Thus, in light of the record, there is nothing to suggest that the court would have granted a motion for judgment of acquittal or arrest of judgment. Accordingly, the state court's resolution of this issue is entitled to deference under § 2254(d) and claim 6 should be denied.

In **claim 7**, Petitioner alleges that his lawyer was ineffective when he failed to investigate DNA swabs from the victim's truck tested to show that Baccari was in the victim's truck when they arrived at the scene of the crime. [ECF No. 1 at 16-17]. Petitioner further claims that this evidence would have corroborated his statement to police, and his theory of defense because, as previously discussed, Bussey testified that Baccari never left Petitioner's truck. [*Id*.]. Petitioner asserts that this is material because Bussey could not have overheard a plan to rob the victim in Petitioner's truck if Baccari was not present. [*Id*. at 17].

In answering the issue when raised in Petitioner's Rule 3.850 Motion, the State argued that the claim, previously raised in Petitioner's postconviction motion for DNA testing, is meritless for the reasons set forth in the State's response to the DNA motion. [ECF No. 17-1, Ex. 17 at 311]. The trial court then denied the Rule 3.850 Motion for the reasons set forth in the State's response. Accordingly, this claim is exhausted and ripe for federal habeas review.

At trial, crime scene investigator Jennifer Martin testified that she swabbed the victim's truck for DNA and completed fingerprinting. [T. 700-701]. On cross, she stated that the swabs were submitted into evidence at the police station, but that the lead detective usually makes the determination of whether such evidence should be tested. [T. 724]. There was no evidence presented at trial regarding the testing of the forensic evidence found in and on the victim's truck.

Neither in the state forum nor this Petition has Petitioner demonstrated that he tested the evidence, much less that such testing would have resulted in confirmation that forensic evidence showing that Baccari was in the victim's truck on the date and time of the murder. Such speculative

assertions do not establish ineffective assistance of counsel. *See Aldrich v. Wainwright*, 77 F.2d 630, 636 (11th Cir. 1985) (speculation insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation).

Moreover, the victim's mother testified that Baccari and the victim were not strangers; they were friends and Baccari actually lived with the victim at some point before the murder. [T. 765-773]. As such, even if Baccari's DNA was present, the State could have explained away the DNA by suggesting that it *could have been* deposited on the victim's truck prior to the date and time in question.[7] Accordingly, the mere presence of Baccari's DNA, while it would have contradicted Bussey's account of what happened on the date of murder, would not have exonerated Petitioner.

However, even assuming the DNA evidence found on the victim's truck would have matched Baccari, there is plainly nothing in the record to suggest that the outcome at trial would have been different. The jury heard Petitioner's recorded statement to police where he stated that Baccari was in the victim's truck and Petitioner followed behind. Co-defendant's counsel also argued in closing that the video, which showed Baccari was not in Petitioner's truck at the gas station, contradicted Bussey's testimony about the robbery. Still, the jury found Petitioner guilty.

Thus, counsel cannot be deemed deficient for failing to request DNA testing and/or demand fingerprint test results prior to trial. *See Knowles*, 556 U .S. at 111 (defense counsel not required to pursue every claim or defense, regardless of its merit, viability or realistic chance for success); *see also Chandler*, 240 F.3d at 917 (counsel is not ineffective for failing to raise a non-meritorious objection). Therefore, the rejection of the claim in the state forum should not be disturbed here. *See Williams, supra.*

---

[7] Petitioner asserts in his Reply that Baccari's DNA on the victim's truck could only have been deposited on the date of the murder. [ECF 28, p. 13]. This is pure speculation without evidentiary support in the record.

In **claim 8,** Petitioner asserts that his constitutional rights were violated when the trial court allowed the jury to hear Baccari's use of a racial slur. [ECF No. 1 at 18]. Petitioner further argues that the State capitalized on this error when it tagged Petitioner as a racist during its closing argument. [*Id*. at 19]. Respondent submits that this claim is unexhausted because Petitioner never raised it in federal constitutional terms in state court. [ECF No. 16 at 41].

Petitioner raised this claim on direct appeal, alleging that the trial court abused its discretion when it admitted Baccari's use of a racial slur during his statement to police. [ECF No. 17-1, Ex. 4 at 47]. In line with that same argument, Petitioner also argued that the trial court erred in not granting a mistrial when the State capitalized on Baccari's use of the racial slur to infer that Baccari and Petitioner colluded to allege that "the black guy did it," when the two accused Bussey of being the shooter. [*Id*. at 49-50]. Within his claim, Petitioner expressly alleges that the trial court's denial of his motion for mistrial based on the State's improper statements during closing argument violated his right to a fair trial under the Sixth Amendment. [*Id*. at 50]. Accordingly, to the extent that Petitioner's argument regarding the admission of the racial slur is intertwined with his argument that the trial court's denial of his motion for mistrial during closing, the court considers the claim exhausted as it was presented to the state court in federal constitutional terms. *See Baldwin*, 541 U.S. at 27; *see also Hartge v. McDonough*, 210 F. App'x 940 (11th Cir. 2006).

The law is clear that the manner in which a state trial court conducts trial proceedings and the admission of evidence are not cognizable in a writ of habeas corpus unless the trial and ultimate ruling during the trial on the issue rendered the trial fundamentally unfair. "As a general rule, a federal court in a habeas corpus case will not review the trial court's actions concerning the admissibility of evidence," *Alderman v. Zant,* 22 F.3d 1541, 1555 (11th Cir. 1994), since the state court "has wide discretion in determining whether to admit evidence at trial, and may exclude

material evidence when there is a compelling reason to do so." *Lynd v. Terry,* 470 F.3d 1308, 1314 (11th Cir. 2006). Moreover, federal courts are bound by a state court's interpretation of its own rules of evidence and procedure. *See Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985). Admission of prejudicial evidence may support habeas corpus relief only where the evidence is "material in the sense of a crucial, critical, highly significant factor." *Id*. (*quoting Osborne v. Wainwright*, 720 F.2d 1237, 1238-39 (11th Cir. 1983)).

Regarding improper prosecutorial remarks during closing argument, the standard is the same: whether the alleged actions rendered the entire trial fundamentally unfair. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 642-45 (1974); *see also Hall v. Wainwright*, 733 F.2d 766, 733 (11th Cir. 1984). In assessing whether the fundamental fairness of the trial has been compromised, the totality of the circumstances are to be considered in the context of the entire trial, *see Davis v. Zant*, 36 F.3d 1538, 1551 (11th Cir. 1983); and "[s]uch a determination depends on whether there is a reasonable probability that, in the absence of the improper remarks, the outcome of the trial would have been different." *Williams v. Weldon*, 826 F.2d 1018, 1023 (11th Cir. 1988).

When discussing co-defendant Baccari's statement during trial, co-defendant's counsel moved to redact certain portions of his recorded statement including when he told police "I don't like blacks." [T. 1344]. The Court agreed that the statement was inflammatory and granted his motion. [T. 1346]. The prosecutor then sought clarification on the court's ruling because Baccari had made multiple racially-motivated statements, including using the "N" word. [T. 1347]. In response, co-defendant's counsel then argued that Baccari's use of the racial slur was "very difficult to hear" and that it was "not clear that he actually [was] using the slur." [*Id*.]. As such, the court stood by its previous ruling. [T. 1347-48]. The court, however, later allowed the admission

38

of the racial slur because it was more probative than prejudicial when viewed in the context of Baccari's statement. [T. 1454].

Based on the court's ruling, the state played Baccari's statement during Prieschl's testimony. [T. 1502]. During the statement, Baccari says that during the incident, Bussey hit him on the head, and saw Bussey pointing the gun at the victim. [*Id.*]. Then, Baccari stated, the victim asked him if he knew Bussey, to which Baccari responded, "No, get this n***** away from me." [*Id.*]. Baccari then heard a gunshot. [*Id.*].

During closing argument, the prosecutor stated the following:

> You heard from Mr. Baccari, Mr. Marquardt that they're good friends. Mr. Marquardt and Mr. Baccari are good friends. So it makes sense that they would point the finger at the person who is not their good friend, point the finger at the black guy.

[T. 2078]. Counsel immediately objected and moved to strike the statement from the record. [T. 2079]. Immediately, the court sustained the objection, granted the motion to strike, and gave a curative instruction, directing the jury to "[p]lease disregard the comment about the black guy." [*Id.*]. No mention of Baccari's use of the racial slur was made during closing argument. Later on, it appears that counsel adopted co-defendant's objections and motion for mistrial based on admission of the racial slur and the improper statements during closing argument. [T. 2099-2100].

Here, Petitioner fails to establish that the admission of the racial slur and the prosecutor's allegedly improper remarks during closing argument rendered his trial fundamentally unfair. The racial slur was attributed to Petitioner's co-defendant, not to the Petitioner. Specifically, Baccari claimed in recounting the events surrounding the murder that he said "[n]o get this n***** away from me" in response to the victim's question regarding whether he knew Bussey. This statement, he claimed, was made seconds before he heard the gunshot. Thus, Baccari's statement, when read in context, related to an alleged altercation between Bussey and the victim, which he claimed

ultimately led to the victim's death. The statement was not made a feature of the trial and was only repeated once when the jury requested to hear a playback of all Baccari's and Petitioner's statements to police. [T. 2268, 2291].

Moreover, the statement was materially different that Baccari's statement "I don't like blacks" that was excluded by the court and redacted from the transcript. The statement, not made in relation to the Baccari's recounting of the murder, was more prejudicial than probative because it was inflammatory and had little value other than to show Baccari's biases to the jury. The statement with the racial slur, however, directly related to the Baccari's statement about what occurred the night of the murder and was material to the evidence presented at trial.

Regarding the prosecutor's statement that Baccari and Petitioner were "point[ing] the finger at the black guy," any prejudice was remedied by the curative instruction read to the jury immediately after the comment.[8] It is generally presumed that jurors follow their instructions. *See e.g., Richardson v. Marsh*, 481 U.S. 200, 211 (1987). In light of this isolated comment and the curative instruction given by the court, Petitioner cannot demonstrate that the trial court's ruling "had a substantial and injurious effect or influence in determining the jury's verdict." *See Sims v. Singletary*, 155 F.3d 1297, 1312 (denying habeas corpus relief on a claim that a motion for mistrial was wrongfully denied) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

Moreover, it cannot be said that the trial court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law or was based on an unreasonable determination of the facts in light of the evidence presented to the State court. Thus, the finding of the state court was neither contrary to nor an unreasonable application of federal constitutional

---

[8] To the extent that Petitioner alleges that he was prejudiced by the statement because she looked directly at a black juror when she said it, such a claim is uncorroborated by the record. In fact, the court noted that the "nonverbal communication, [and] the intonation" of the prosecutor's statement did not seem to be "racially motivated." [T. 2099].

principles under *Williams*, and its rejection of the claim should not be disturbed here. Claim 8 should be denied.

In **claim 9**, Petitioner argues that the trial court's refusal to read back all Bussey's testimony unfairly emphasized the state's case. [ECF No. 1 at 20]. By reading only Bussey's direct examination, Petitioner claims that the jury failed to hear about crucial inconsistencies in his testimony. [*Id*.]. Respondent submits that this claim is unexhausted because Petitioner failed to raise it in federal constitutional terms on direct appeal. [ECF No. 16 at 47].

In his Reply, Petitioner acknowledges that he initially raised this claim only in terms of state law. [ECF No. 28 at 16]. However, he claims that he filed a motion for rehearing which included federal law. [*Id*. at 16]. In this case, Petitioner previously filed a motion to expand the record to include his motion for rehearing and a supplemental petition for writ of habeas corpus, where he alleged that counsel was ineffective for failing to raise his issue (and others) in federal constitutional terms on direct appeal. [ECF No. 24]. The Court, however, denied the request, finding that expansion of the record was not necessary to resolve Petitioner's claims. [ECF No. 27].

Here, review of the appellate brief reveals that Petitioner raised a claim that the trial court committed reversible error when it failed to read back Bussey's cross-examination in response to the jury's question. Petitioner, however, only raised this claim as a violation of state law. [ECF No. 17-1, Ex. 4 at 57-58]. The Fourth DCA *per curiam* affirmed Petitioner's judgment of conviction without written opinion. *See Marquardt v. State*, 163 So.3d 1217 (2015). After the Fourth DCA affirmed his conviction, Petitioner then attempted to "federalize" his claims through the filing of his motion for rehearing.

It is well-settled under both Federal and Florida law "[a]n issue not raised in an initial brief is deemed abandoned and may not be raised for the first time in a reply brief." *See Hoskins v. State*, 75 So.3d 250, 257 (Fla. 2011) (quoting *Hall v. State*, 823 So.2d 757, 763 (Fla. 2002)); *see also* Fla. R. App. P. 9.330 (a motion for rehearing "shall not present issues not previously raised in the proceeding); *United States v. Levy*, 379 F.3d 1241, 1242-1245 (11th Cir. 2004). Accordingly, Petitioner's claim is unexhausted as it was never fairly presented to the state court in federal constitutional terms.

Here, in the instant petition, Petitioner fails to allege any cause to excuse the failure to exhaust his claim in state court. To the extent that Petitioner argues, in objections or otherwise, that the procedural default of his claim can be excused under *Martinez v. Ryan*,[9] such a claim is without merit. Martinez pertains only to the failure to raise claims of ineffective assistance of trial counsel. *See Gore v. Crews*, 720 F.3d 811, 816-17 (11th Cir. 2013).

However, even if the Court were to consider Petitioner's claim properly exhausted, it is still not cognizable in the instant petition because, contrary to Petitioner's representations in his Reply [ECF No. 28 at 16], he has failed to raise an issue of federal law in relation to this claim. Although he claims in his Reply that "the thrust of his claim is that [his] federal due process rights to a fair trial" were violated, he failed to raise this due process claim in his operative petition. [ECF No. 1 at 20]. Instead, he claimed that the trial court unfairly emphasized the state's case" and "abuse[d] [its] discretion" when it refused to read back Bussey's cross-examination. [*Id.*]. Such a claim is not cognizable in a federal habeas petition. *See Branan v. Booth*, 861 F.2d 1507, 1508

---

[9] In *Martinez,* 566 U.S. 1 (2012), the Supreme Court expanded what "cause" may excuse a procedural default, determining that when a state court claim of "ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 566 U.S. at 17.

(11th Cir. 1988); *see also Disanto v. Sec'y, Dep't of Corr.*, 8:13-CV-1452-T-36TBM, 2016 WL 5373490, at *6 (M.D. Fla. Sept. 26, 2016) (finding trial court abuse of discretion claim is not cognizable on habeas review); *Bunion v. Sec'y, Dep't of Corr.*, 8:15-CV-760-T-36MAP, 2018 WL 1072024, at *6 (M.D. Fla. Feb. 27, 2018). Accordingly, claim 9 should be denied.

In **claim 10**, Petitioner alleges that his constitutional rights were violated when the jury returned a verdict inconsistent with the indictment. [ECF No. 1 at 21]. Specifically, he claims that the indictment alleged that either Petitioner or Baccari pulled the trigger, but the jury concluded that neither of them shot the victim. The jury instruction, which told the jurors that he could be found guilty of murder if "another principal" to the robbery shot and killed the victim "opened the door" for the jury to convict him for a crime not charged in the indictment. [*Id*.].

Respondent submits that this claim is unexhausted because Petitioner failed to raise it in federal constitutional terms on direct appeal. [ECF No. 16 at 48]. However, review of Petitioner's direct appeal brief reveals that he specifically alleged that because the original indictment was not clear, the State was able to expand its prosecution theory, violating the "Fifth Amendment and Fourteenth Amendments to the Constitution." [ECF No. 17-1, Ex. 4 at 70]. Petitioner also referenced his "fundamental right" to be informed of the nature of the charges against him in accordance with the Supreme Court's decision in *Cole v. Arkansas*, 333 U.S. 196, 201 (1948). [*Id*. at 69]. Thus, it appears that Petitioner fairly presented the issue raised in claim 10 in federal constitutional terms on direct appeal. It is, therefore, exhausted and ripe for habeas review.

As discussed previously, Petitioner and Baccari were charged with first degree murder with a firearm for unlawfully shooting the victim during the commission of a robbery. [ECF No. 17, Ex. 1]. The indictment specifically alleged that Petitioner "and/or" Baccari possessed a firearm and discharged it, resulting in the victim's death. [*Id*. at 2]. The indictment cited Fla. Stat.

§ 777.011, which defines "principal" in the first degree. [*Id*.].  The indictment did not, however, indicate which individual was the "principal." [*Id*.]. When the trial court instructed the jury at the end of the trial, it stated the following:

> To prove the crime of first degree felony murder, the State must prove the following three elements beyond a reasonable doubt. One, John Blazevige is dead. Two, A, the death occurred as the consequence of and while Michael Marquardt was engaged in the commission of a robbery; or, B, the death occurred as a consequence of and while Michael Marquardt was attempting to commit robbery; or C, the death occurred as a consequence of and while Michael Marquardt or an accomplice was escaping from the immediate scene of robbery; and three, John Blazevige was killed by a person other than Michael Marquardt, but both Michael Marquardt and the person who killed John Blazevige were principals in the commission of robbery.

[T. 1866-67]. As to the definition of "principal," the jury was instructed as follows:

> If the defendant helped another person or persons commit or attempt to commit a crime, the defendant is a principal and must be treated as if he had done all of the things the other person or persons did if, one, the defendant had a conscious intent that the criminal act be done; and two, the defendant did some act or said some word which was intended to and which did insight [sic], cause, encourage, assist or advise the other person or persons to actually commit or attempt to commit the crime.

[T. 1877]. When the jury returned its verdict, it found that Baccari did not possess a firearm during the commission of the offense. They were nevertheless convicted of murder. Petitioner submits, therefore, the only logical conclusion from the jury's verdict is that the jury found that Bussey was the shooter. This, however, was not charged in the indictment.

The Supreme Court has held that the accused has a constitutional right to a notice of the case the prosecution will present at trial. *See Kotteakos v. United States*, 328 U.S. 750 (1946). The Eleventh Circuit has established a two-step inquiry when considering allegations of variance between indictments and proof at trial: (1) the Court must first determine whether material variance did indeed occur, and, if so, (2) whether the defendant suffered substantial prejudice as a result of the variance. *See United States v. Prince*, 883 F.2d 953, 959 (11th Cir. 1989). To establish such

prejudice, the defendant must show that "the proof at trial differ[s] so greatly from the charges in the indictment that the defendant was unfairly surprised and had an inadequate opportunity to prepare a defense." *United States v. Caporale*, 806 F.2d 1487, 1500 (11th Cir. 1986).

A "constructive amendment" or "fatal variance" to an information or indictment occurs when the government, through its presentation of evidence or its argument, or the district court, through its instructions to the jury, broadens the possible bases for conviction beyond that contained in the Indictment. *See United States v. Castro*, 89 F.3d 1443, 1452–1453 (11th Cir. 1996); *see also United States v. Williams*, 527 F.3d 1235, 1246–47 (11th Cir. 2008); *United States v. Tampas*, 493 F.3d 1291, 1301 (11th Cir. 2007). "[N]ot all differences between an indictment and the proof offered at trial, rise to the 'fatal' level of a constructive amendment." *United States v. Randall*, 171 F.3d 195, 203 (1999). Moreover, when reviewing whether a variance exists, the evidence must be viewed in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict. *See Castro*, 89 F.3d at 1450 (citing *United States v. Church*, 955 F.2d 688, 693 (11th Cir. 1992)).

Here, Petitioner's claim that the jury necessarily found that Bussey was the shooter is pure speculation. In pertinent part, in Petitioner's sworn statement to police, he stated that after arriving at what he thought was the victim's house, Bussey grabbed Petitioner's brother's gun out of the console [T. 1472], came out of Petitioner's car and started yelling at Baccari and "scuffling" with him. [T. 1468]. The victim then got out of the truck, and Bussey started yelling at him to get back in the truck, and then Petitioner heard a bang. [T. 1469]. Petitioner specifically told police that he saw Bussey shoot the victim with a gun in his right hand, and that Bussey was wearing a glove. [T. 1475]. Petitioner then stated that he had not seen the gun since the incident. [T. 1479]. When

later questioned with his attorney present, Marquardt stated that there was a loaded magazine on the floorboard in the backseat of the truck. [T. 1481].

When Baccari talked to police, he told a different story. He said that he met with the victim himself in a Walgreens parking lot. [T. 1492]. During their meeting, the victim asked Baccari to get him heroin. [T. 1493]. Baccari made arrangements with a "dude," who Baccari later identifies as Bussey, to get the drugs, and when Bussey got there, he tried to rob them and shot the victim. [T. 1494]. Baccari told police that he ran away on foot from the scene. [T. 1499]. Baccari denied that his DNA would be found on the slide or trigger of the gun. [T. 1507].

There were, therefore, clear inconsistencies between Baccari's and Petitioner's stories about what happened the night of the murder. Contradicting both accounts, a disinterested civilian witness, Sergio George, testified that he saw a single, male individual outside the truck, who was either "Hispanic or white," but not black (like Bussey). [T. 1319]. Moreover, Bussey testified that he could not have jumped out of the truck because he was sitting in the backseat, and the truck had "suicide" doors such that the only way to get out of the car was by opening the front door first, and the someone would have to open the back door to let him out. [T. 836, 865].

When the DNA expert testified at trial, she stated that there were only criteria to call an individual the source of a certain DNA profile if their profile is so rare that it is less than 1 in 300 billion. [T. 1366]. Both Petitioner's DNA and Bussey's DNA were found on the holster of the gun, with Petitioner being the source of the major DNA profile. [T. 1368]. Petitioner's and Bussey's DNA also could not be excluded from the sample found on the grip or hammer area of the gun. [T. 1372-74]. Baccari's or Bussey's DNA could not be excluded from the slide area of the gun. [T. 1377]. Bussey and the victim could not be excluded as the source of the DNA found on the decocker area of the gun or the trigger guard area of the gun. [T. 1382, 1387*]*. With the exception

of the holster of the firearm, where Petitioner was identified as the source, the expert was unable to say conclusively that DNA from any of the five men (Thomas Marquardt, Baccari, Victim, Petitioner, and Bussey) on any of these locations on the firearm. [T. 1388]. The testimony about Bussey's DNA on the gun was consistent with his testimony that Petitioner made him hold the gun after the incident, and inconsistent with Petitioner's statement to police that Bussey was wearing a glove during the shooting.

Given the inconsistencies between Petitioner's statement and the evidence presented at trial, his claim that the jury concluded that Bussey was the shooter is pure speculation. Even though it was the state's theory that Baccari was the shooter, the jury was free to make findings not consistent with the state's prosecution theory as long as those findings did not contradict the crimes alleged in the indictment. While the jury found that Baccari did not discharge the firearm during the commission of the offense, it is possible that this verdict was the result of a jury pardon, or simply, the jury's belief that the State had not met its burden of proof regarding possession of the firearm. It does not, however, necessarily follow that they jury conclusively determined that Bussey was the shooter.

Moreover, even if the jury determined that Bussey was the shooter, Petitioner was adequately advised of such a possibility. Specifically, in Count 3 of the Indictment, Petitioner was charged with accessory after the fact for assisting Antonio Bussey and/or Louis Baccari after the murder, knowing that Antonio Bussey and/or Louis Baccari had committed first degree murder with a firearm. [ECF No. 17-1, Ex. 1 at 3]. Moreover, Bussey pled guilty to the murder. Thus, in the context of the trial, the jury instructions informing the jury that they could convict Petitioner of first degree murder if "a person other than [himself]" killed the victim and Petitioner and the person who killed the victim were principals in the commission of the robbery, did not result in a

constructive amendment to the Indictment.  Therefore, when viewed in the light most favorable to the State, there is no substantial likelihood that Petitioner may have been convicted of an offense other than the one charged in the indictment. Claim 10 should be denied.

In **claim 11**, Petitioner asserts that his due process rights were violated when the trial court and appellate court refused to test DNA swabs and reveal fingerprint test results which will exonerate him. [ECF No. 1 at 23]. Petitioner raised a similar ground in claim 7, where he argued that his lawyer was ineffective for failing to obtain fingerprint test results and for failing to secure DNA testing on the swabs recovered from the victim's truck. As in claim 7, Petitioner alleges that this forensic evidence would have directly contradicted Bussey's testimony about the facts leading up to the murder. [*Id*.].

The Respondent claims that it does not understand Petitioner's argument, and that it should be summarily denied as inadequate to merit a response. [ECF No. 16 at 51]. In Petitioner's Reply, however, he seems to clarify that he is challenging the denial of his Rule 3.853 motion for postconviction testing. [ECF No. 28 at 18]. Thus, when liberally construing Petitioner's claim, it appears that Petitioner means to allege that the state court violated his due process rights by denying his request for postconviction DNA testing. To the extent that he argues that counsel was ineffective for failing to obtain forensic test results, that argument has been addressed in claim 7.

The Eleventh Circuit has repeatedly held that challenges to the process afforded petitioners in state postconviction proceedings do not provide a basis for habeas relief. *See Taylor v. Sec'y, Fla. Dep't of Corr.*, 760 F.3d 1284, 1299 n.3 (11th Cir. 2014) (citing *Carroll v. Sec'y, Dep't of Corr.*, 574 F.3d 1354, 1365 (11th Cir. 2009); *Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir. 1987) (*per curiam*)). The Eleventh Circuit established this principle on the basis that state postconviction proceedings do not undermine the legality of the detention or imprisonment-*i.e.*,

the conviction itself-and thus habeas relief is not an appropriate remedy. *See Spradley*, 825 F.2d at 1568. Further, such challenges often involve claims under state law-for example, Florida Rules of Criminal Procedure 3.850 and 3.851, which govern the availability of, and procedures attendant to, post-conviction proceedings in Florida. Thus, "[a] state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved." *See McCullough v. Singletary*, 967 F.2d 530, 535 (11th Cir. 1992).

Under these circumstances, Petitioner's claim that the state trial court violated his due process rights by failing to grant his motion for DNA testing under Florida Rule of Criminal Procedure 3.853 on his post-conviction motion does not state a claim on which this Court may grant habeas relief. *See Spradley, supra*.; *see also Thompson v. Rundle*, 393 F. App'x 675, 679 (11th Cir. 2010 (stating that there is no substantive due process right to postconviction access to DNA evidence). Therefore, Petitioner is not entitled to relief on this claim.

In **claim 12**, Petitioner alleges he received ineffective assistance of appellate counsel where his lawyer failed to certify a conflict with *Rocker v. State*, 122 So. 3d 898 (Fla. 2d DCA 2013) to the Florida Supreme Court. Respondent asserts that this claim is meritless. [ECF No. 16 at 55].[10]

Petitioner's claim is unpersuasive. Under Fla. R. App. P 9.030, the discretionary jurisdiction of the Florida Supreme Court may be sought to review decisions of district courts of appeal that "expressly and directly conflict with a decision of another district court of appeal or of the supreme court on the same question of law." Fla. R. App. P. 9.030(a)(2)(A)(iv). The Supreme Court of the United States, however, has held that a "criminal defendant does not have a constitutional right to counsel to pursue discretionary state appeals or applications for review in

---

[10] Upon review of the record, the Court issued a supplemental order to show cause directing the respondent to address the exhaustion and merits of claims 12 and 13 because its initial response was deficient. [ECF No. 57]. However, the Court need not address the complicated exhaustion issues associated with this claim because even under a *de novo* standard of review, the claim fails. *See Lambrix*, 520 U.S. at 525.

[the Supreme Court]." *Wainwright v. Torna*, 455 U.S. 586, 587 (1982). In *Wainwright*, a § 2254 petitioner claimed that his appellate counsel was ineffective because he filed an application for a writ of certiorari in the Florida Supreme Court, which was subsequently dismissed as untimely. *See id*. at 586. In determining that Petitioner was not entitled to relief on his ineffectiveness claim, the Supreme Court relied on its previous decision in *Ross v. Moffitt*, 417 U.S. 600 (1974), and stated that because the petitioner "had no constitutional right to counsel [on discretionary review], he could not be deprived of the effective assistance of counsel by his [lawyer's] failure to file the application timely." *Id*. at 587-588.

Thus, regardless of whether or not a direct conflict exists in Petitioner's case with *Rocker*, he cannot claim ineffectiveness based on his counsel's failure to certify a conflict when he had no constitutional right to an attorney in discretionary review proceedings. *See Coleman v. Thompson*, 501 U.S. 722, 725 (1991); *see also*, *Stires v. Sec'y, Dep't of Corr.*, 8:07-CV-1689-T-30TBM, 2009 WL 2407748, at *15 (M.D. Fla. Aug. 3, 2009). Accordingly, claim 12 should be denied.

In **claim 13**, Petitioner alleges that appellate counsel was ineffective for failing to raise a fundamental error in the jury instructions where the manslaughter instruction was not given even though it was mandated under Florida law. [ECF No. 1 at 26]. Respondent submits that this appellate counsel cannot be deemed ineffective for failing to raise this argument when trial counsel made it clear that he did not want the instruction, and therefore, waived the issue for purposes of appeal. [ECF No. 16 at 17].

Contrary to the Respondent's argument in its response to the Court's supplement order to show cause [ECF No. 60], this claim was properly exhausted. Petitioner raised it in his petition for writ of habeas corpus alleging ineffective assistance of appellate counsel in the Fourth DCA. [ECF

No. 17-1, Ex. 10]. The Fourth DCA summarily denied the petition without comment. [*Id.*, Ex. 13]. Consequently, the issue was properly exhausted for purposes of federal habeas review.

When evaluating a claim of ineffective assistance of appellate counsel, a petitioner satisfies the prejudice prong upon showing that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [appeal] would have been different." *Strickland*, 466 U.S. at 694); *see also Ferrell v. Hall*, 640 F.3d 1199, 1236 (11th Cir. 2011) (to prove prejudice, petitioner alleging appellate ineffectiveness must show that "the outcome of the appeal would have been different" (citations omitted)).

Consideration of ineffective assistance of appellate counsel requires the reviewing § 2254 court to "consider all the circumstances … from counsel's perspective at the time." *Dell v. United States*, 710 F.3d 1267, 1273 (11th Cir. 2013) (quoting *Strickland,* 466 U.S. at 689). Further, "[a]ppellate counsel has no duty to raise every non-frivolous issue and may reasonably weed out weaker (albeit meritorious) arguments." *Id.* (citation omitted). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Id.* (quoting *Smith v. Robbins*, 528 U.S. 259, 288 (2000)); *see also Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017) ("Declining to raise a claim on appeal . . . is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court." (citation omitted)). Under § 2254(d), double deference applies to this determination. *Overstreet*, 811 F.3d at 1287 (citing *Harrington*, 562 U.S. at 105).

Furthermore, when the decision of the last state court to decide a federal claim contains no reasoning and there is "no lower court opinion to look to," *Wilson*, 138 S. Ct. 1188 at 1195, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 562 U.S. at 99 (citation

51

omitted). Thus, in this scenario, "[s]ection 2254(d) applies even [though] there has been a summary denial." *Cullen*, 563 U.S. at 187 (citation omitted). Because § 2254(d) applies, and because the last state court decision is unreasoned and there is no lower court decision to look through to, "a habeas court must determine what arguments or theories . . . could have supported[] the state court's decision[] and … ask whether [they] are inconsistent with [Supreme Court precedent]." *Harrington*, 562 U.S. at 102.

Pursuant to the Florida Standard Jury Instructions which were in place at the time of Petitioner's trial, manslaughter is a category one lesser included offense of first-degree felony murder.[11] *See* Fla. Sta. Jury. Instr. 7.3. In *State v. Abreu*, the Florida Supreme Court held that the failure to instruct on a next immediate lesser-included offense is *per se* reversible error. It thus appears that the trial court, under Florida law, should have instructed the jury as to the lesser included offense of manslaughter. When the issue of lesser included offenses came up during trial, the Court discussed the issue with the parties:

| | | |
|---|---|---|
| THE COURT: | …What lesser, if any, do you want? | |
| COUNSEL: | This is easy, Judge.. The only lesser that we'd be requesting are those that are mandatory lessers pursuant to the Florida rules. | |
| THE COURT: | Okay. | |
| COUNSEL: | So we're not asking for anything in addition to that which is mandated. | |
| THE COURT: | I don't think anything is mandated, that you must have lesser. | |
| COUNSEL: | I – I think the State – well, at least the State has – | |
| THE COURT: | But – but I think it's lesser that --- that the State wants them and you can't object to it. | |
| COUNSEL: | Okay. | |
| THE COURT: | So if the State wants no lessers, you want no lessers? | |
| COUNSEL: | Correct. | |

[T. 1260-61].

---

[11] Respondent asserts that a manslaughter instruction was two steps removed from first degree murder. [ECF No. 16 at 20]. This is patently incorrect. *See* Fla. Stan. Jury. Inst. 7.3.

When the specific issue of the manslaughter instruction was discussed during trial, the following exchange took place:

THE COURT: …Manslaughter, is anybody asking for manslaughter?
PROSECTUOR:       No. I was just putting it there is case anyone wanted it.
THE COURT.        Ok. Manslaughter is out.

[T. 1265-66]. The Court later addressed the issue again:

THE COURT:        All right. That takes us to – no one wants manslaughter, right, 7.7 is
                  out?
PROSECUTOR:       Yes.
THE COURT:        All right, 7.7. is out.

[T. 1275].

Thus, while counsel stood silent when the Court discussed the manslaughter instruction, he specifically noted that he was not asking for any lesser included offense instructions that were not mandatory under Florida law, and that he was not requesting any lessers if the State wasn't requesting any. [T. 1260-61]. Thus, it is arguable, under Florida law, whether counsel's express request for no lesser included offenses constituted an affirmative waiver of fundamental error. *See e.g. Armstrong v. State*, 579 So. 2d 734 (Fla. 1991) (finding fundamental error was waived in Florida because defense counsel affirmatively requested a limited manslaughter instruction); *see also Ray v. State*, 403 So. 2d 956 (Fla. 1981).

Thus, because there is some evidence in the record to suggest that counsel affirmatively waived any fundamental error by expressly not requesting any lesser included offenses, the Fourth DCA could have reasonably relied on this theory in denying this claim when Petitioner raised it in his petition for writ of habeas corpus alleging ineffective assistance of appellate counsel. *See Harrington*, 562 U.S. at 102 ("Under § 2254(d),  habeas court must determine what arguments or theories…could have supported[] the state court's decision[] and…ask whether [they] are inconsistent with [Supreme Court precedent]."); *see also Sexton v. Beaudreaux*, 585 U.S. ___, 138

S. Ct. 2555, 2557, 2559-60 (2018) (*per curiam*) (suggesting that, under *Harrington's* "could have supported" directive, habeas courts must consider "reasonable grounds that could have supported the state court's summary decision" (emphasis added)).

Therefore, the Court interprets the Fourth DCA's summary rejection of Petitioner's ineffective assistance of appellate counsel claim as implicitly determining that no fundamental error occurred regarding the trial court's failure to instruct the jury on manslaughter as a lesser included offense. *See Pinkney v. Sec'y, Dep't of Corr.*, 876 F.3d 1290, 1297 -99 (11th Cir. 2017) (interpreting Florida appellate court's summary rejection of an appellate counsel claims as having been based on theory that alleged error was not fundamental, and as such, the appellate court would not have granted reversal on that claim if appellate counsel had raised it on direct appeal); *see also Wainwright v. Goode*, 464 U.S 78, 84 (1983) (finding the decisions of state's highest court regarding state law "are binding on the federal courts").

Here, counsel failed to object to the court's failure to instruct the jury on the offense of manslaughter, therefore, the issue was waived for purposes of appeal. Thus, because the state court implicitly determine that the erroneous instruction was not fundamental error, appellate counsel cannot be deemed ineffective for failing to raise it on direct appeal. Moreover, Petitioner cannot demonstrate any prejudice because he fails to demonstrate that he would have been successful on appeal had counsel raised this meritless issue. Accordingly, the state court's resolution of this claim is entitled to deference under § 2254(d) and claim 13 should be denied.

In conclusion, the record reflects that Petitioner received vigorous and able representation more than adequate under the Sixth Amendment and *Strickland*. Defense counsel made a reasonable investigation of the facts, was well-prepared for trial, conducted full and extensive cross-examination of the state's witnesses, made appropriate objections, moved for judgment of

acquittal, and presented a forceful closing argument. Petitioner has failed to demonstrate that he was deprived of constitutionally effective assistance of counsel for any or all of the reasons alleged above. Petitioner is not entitled to relief on any of the claims presented.

## VIII. Evidentiary Hearing

The burden is on the Petitioner to establish the need for a federal evidentiary hearing. *See Chavez v. Sec'y, Fla. Dep't of Corr.,* 647 F.3d 1057, 1060 (11th Cir. 2011). To determine whether an evidentiary hearing is needed, the question is whether the alleged facts, when taken as true, are not refuted by the record and may entitle a petitioner to relief. *See Schriro v. Landrigan,* 550 U.S. 465, 474 (2007); *see also Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318-19 (11th Cir. 2016). The pertinent facts of this case are fully developed in the record before the Court. Because this Court can "adequately assess [Petitioner's] claim[s] without further factual development," *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing is not warranted.

## IX. Certificate of Appealability

A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a certificate of appealability ("COA"). *See* 28 U.S.C. § 2253(c)(1); *see also Harbison v. Bell,* 556 U.S. 180, 183 (2009). This Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). Where a district court has rejected a petitioner's constitutional claims on the merits, the Petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See Slack v. McDaniel,* 529 U.S. 473, 484 (2000). However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that

jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* Upon consideration of the record, this Court should deny a certificate of appealability.

## X. Conclusion

Based upon the foregoing, it is recommended that:

1.      the Petition for Writ of Habeas Corpus [ECF No. 1] be DENIED;

2.      final judgment be entered in favor of Respondent;

3.      a certificate of appealability be DENIED; and,

4.      the case CLOSED.

Objections to this Report may be filed with the District Judge within fourteen days of receipt of a copy of the Report. Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." *See* 11th Cir. R. 3-1 (2016); *see also* 28 U.S.C. § 636(b)(1)(C); *Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

Signed this 27th day of July, 2021.

UNITED STATES MAGISTRATE JUDGE

cc:     Michael Marquardt
        B10725
        Avon Park Correctional Institution
        Inmate Mail/Parcels
        8100 Highway 64 East
        Avon Park, FL 33825
        PRO SE; and

        All of Counsel of Record